## In re Samuel W. Salus

*C. Brewster Rhoads,* for Committee of Censors.

*John P. Connelly,* for respondent.

PER CURIAM, April 15, 1935.—The testimony taken in the case of the respondent Samuel W. Salus relates primarily to three subjects of investigation, namely: (1) his representation of persons engaged in the so-called "numbers racket"; (2) his employment of runners to solicit business in the criminal courts, and more particularly in this connection the obtaining of such business by payments made by the runner to employes of the police department; and (3) his connection with the so-called "Kroekel case".

1. It is not necessary to set forth in connection with this respondent's case the details regarding the representation by his office of defendants engaged in the "numbers racket". The nature and the methods of such representation have been fully discussed in our opinion rendered in the case of Herbert W. Salus. As there pointed out, the testimony is convincing that the Salus office represented a great number of defendants accused of setting up an illegal lottery, that bail was obtained for many of them without their knowledge and without cost to them, that they neither paid a fee to the Salus firm nor were they asked for any, and that they themselves had nothing whatever to do with engaging the services of the Salus office to represent them. These circumstances together with other testimony convinced the court that the Salus firm represented so-

called "higher-ups" in the "numbers racket" who were engaged in the continuing business of such crime, that the Salus firm more or less regularly accepted compensation from such higher-ups to defend their subordinates and agents in the pursuit of this continuing criminal business, and that they thereby made themselves in practical effect, a branch or agency of such criminal business itself.

We have held in the case of Fred S. Gartner, that the fact that one is a partner in a firm guilty of such practices will not make him liable to punitive action by the court unless there be evidence that he actually participated in such practices, or that he at least had knowledge of them; such a partner, however, is properly the subject of reprimand for his negligence in not better informing himself of such practices on the part of his office.

In the present case the testimony is fairly to the effect that the respondent Samuel W. Salus was not aware of what his firm did by way of representation of persons charged with setting up an illegal lottery. There is nothing to prove that the defendants in such cases or the higher-ups who employed them came into personal contact with the respondent or that he arranged for the fees or was responsible for the practices engaged in. He himself testified that he did not know much about the numbers cases in the office because he seldom handled any of the details, and that his brother Herbert had charge of such matters. He said that he had heard of Lew Baron being a numbers backer but that he did not have the "faintest idea" about the connection of any of the defendants in numbers cases with Baron; that he did not know Tom Matthews or anything about him, and that while he had heard the name Guinea-Face Lew Lalli he did not know "the first thing about him". The respondent explained this ignorance in regard to his clients by calling attention to the fact that during the years 1933 and 1934 he was engaged largely in attending sessions of the legislature and in activities connected with political campaigns and therefore was not in as close touch with his office as he otherwise would have been. Indeed the full responsibility for the methods of representation of defendants in the numbers cases was assumed by Herbert W. Salus, who testified that he was primarily responsible for that portion of their practice, and that the circumstances concerning his office being retained in such cases was mostly within his "purview".

The respondent Samuel W. Salus indicated a proper conception of the viciousness of the practice here under investigation when, in answer to the question: "Might not it be . . . that some of these defendants who have not retained you or paid any fee have had your office retained by the so-called higher-ups in the numbers game and there be paid for by them?" he replied: "If anybody came with a proposition like that to my house I would throw them out."

Concluding that the evidence does not prove knowledge on the part of the respondent in regard to this matter, the court is of opinion that, while the respondent, notwithstanding his public duties and political activities, should be reprimanded for not knowing that such practices were being more or less continuously carried on by his office, especially as he is the senior member of his firm, no further action would be warranted as far as this particular charge is concerned.

2. The situation, however, is quite different in regard to what must have been the respondent's knowledge as to the connection of the Salus office with the so-called "drunken drivers racket", and the employment of runners to solicit criminal business: Indeed the respondent himself testified: "I know a good deal that goes on generally in the office. I don't bother much about the

finances but as to supervision I would know what is going on." Again, having been questioned as to the connection of certain alleged runners with his office, and having testified that no compensation was paid to them, he was asked: "When you say that, you would know?" and he replied: "I would know about those men, yes, sure." And again, when asked: "You would know whether or not there was any arrangement whereby you paid anyone for bringing them (drunken driver cases) in?" he answered: "Absolutely."

It can readily be understood that while the respondent might not know all the facts concerning clients and retainers and fees paid by them, he certainly must know, as he frankly admits knowing, the status and activities of persons who were connected with the office to the extent at least of having there a physical habitation.

It is to be noted that as regards this subject also the respondent shows that he realizes the fact that the practice of his office here under investigation was, if it existed, an iniquitous one, because, when asked: "And there is no arrangement and no policemen therefore would participate in any part of any fee for a case sent to your office, directly or indirectly through them, or be paid a flat sum irrespective of the fee?" he answered: "Certainly not. You don't think I am foolish enough to become a criminal in my life. That is criminal—that is indirect bribery—nothing short of that."

It was the respondent's contention that his office employed no runners, that Edward Blasband received no recompense for cases which he brought to the office other than the patronage which he received in the bail business given him by the office, that Maurice Seisman, Michael Sporkin and Joseph J. Naythons were not connected with the office and received no compensation from it. Similar denials were made by Herbert W. Salus, Albert P. Goldberg and Blasband himself.

The court is of opinion, however, that the men named were very definitely connected with the Salus office, that they did seek and obtain cases for it, and that at least some of them received compensation therefor. More particularly this applies to Blasband, who appears to have been a regular runner for the office and to have secured clients in drunken driver cases by bribery or "tipping" of employees of the police department. Indeed the evidence is wholly convincing that Blasband made an arrangement with George Cianfrani and Bertram C. Wambold, who were switchboard operators in the office of the chief surgeon of the police department, whereby they, whose official duty it was to give out the calls to district surgeons as to where they should go to examine drunken drivers, regularly gave information to Blasband of the arrests and whereabouts of such prisoners. Blasband called them up on the telephone five to eight times a night in order to obtain such information. Under this arrangement Blasband was to pay these operators $5 for every case in which he obtained from the prisoner the business of entering bail for him. It was the habit of Blasband, upon calling up and getting such information, to visit the station house where the prisoner was confined, appearing there at all hours of the night (as was testified to by witness after witness) and covering all of the station houses of the city. There, by reason of friendly contacts with the police authorities in charge, he gained the privilege of a personal interview with the prisoner (a privilege apparently denied to all other visitors), handed him the business card of the Salus office, and urged upon him the advisability of getting that office to represent him, in several cases fortifying his salesmanship by stating that the Salus office was influential politically and in the courts and could thereby obtain better results for the prisoner. It further appears that Blasband negotiated fees, and in

several instances, having obtained the release of the prisoner on a copy of the charge (which he appears always to have been able readily to accomplish), he himself took the prisoner to the Salus office. It would seem from the testimony that he devoted his energies solely to persons of some means, who, being placed in a disagreeable predicament arising from their misconduct and being fearful of punitive and social consequences, were particularly susceptible to persuasion aimed to induce them to pay a large fee out of all proportion to the purely professional services rendered. The evidence shows that in some of these cases the respondent demanded and received $500, and in at least one of them as much as $1,500 for legal services involving nothing more than an appearance at a magistrate's hearing. The fact that Mr. Goldberg referred to one such magistrate as "favoring" them, together with the further fact of the successful results apparently obtained by the Salus office in cases before that magistrate, make the amounts of the fees in question a matter of possibly sinister significance as indicating that they were intended to be based upon the factor of "influence" rather than the normal services to be rendered by a member of the bar.

The system employed by Blasband and the Salus office may be said, therefore, to have involved these very improper elements: (1) securing retainers through the services of a runner—incidentally a person with a criminal record and now under bail on the charge of perjury for giving false testimony in the present hearing; (2) obtaining business by such runner through an arrangement of bribery or "tipping" of police officials; (3) frightening prisoners as to the possible consequences of their situation and of the charges against them; (4) obtaining in many cases what would seem to be exorbitant fees as the result of the fear thus aroused in the prisoners and the hope held out to them of results to be obtained otherwise than through the due processes of the law. To the extent to which the respondent and his partners were not themselves actors in these matters they were, in the opinion of the court, fully cognizant of what was being done by Blasband and of the methods pursued by him. The evidence was to the effect that during the period of the last 8 months of 1934 Blasband, Sporkin and four other persons who are alleged to have been agents working for Blasband, took out 92 copies of charges in drunken driver cases, of which number the Salus office came to represent 30 or 32.

As to the contention of the respondent and the other members of his firm that Blasband was not compensated for bringing these cases to the office, the court has no hesitation in finding the fact to be otherwise. The court is of opinion that Blasband and the members of the Salus firm did not testify truthfully on this point. There were placed in evidence about 40 checks to Blasband in varying sums, mostly $25 to $50, but in some instances in larger amounts, all of them dated within the period 1933-1934. Some of them, according to Blasband and Herbert W. Salus, were payments for bail obtained by Blasband for clients of the Salus office, but a large number of them were said to be "loans" to Blasband. In addition to these checks Blasband stated that on many occasions, ranging from once a week to once in four weeks, cash "loans" of $5, $10, or $25 were made to him. It was claimed that these alleged "loans" were always repaid within a day or two after the "loans" were made, but at the present time, according to Blasband's testimony, he "owes" to the Salus office an amount stated by him to be between $500 and $1,000.

In the same way a large number of checks to Michael Sporkin were placed in evidence, also covering the years 1933-1934, the amounts ranging generally between $12.50 and $50, but in some instances in larger amounts, which checks,

according to Herbert W. Salus, were nearly all in payment for bail, but in some few cases represented "loans" to Sporkin.

There were also checks to Maurice Seisman placed in evidence, the amounts of these checks being larger, for example, $100, $125, $150, $245, $400. And there were checks of smaller amounts to Joseph J. Naythons, which, according to Herbert W. Salus, represented "loans" made to Naythons by the Salus office from time to time.

While it cannot be said that there was any actual evidence to the effect that Seisman and Naythons were runners for the Salus office, there was testimony indicating that Sporkin might be placed in that category, and there was overwhelming evidence in regard to Blasband. Certainly, as far as the checks to Blasband are concerned, it is straining the credulity of the court to pretend that the checks to him represented ordinary "loans". Considering the number of those checks it seems impossible to believe that "loans" should have been made in such regularly recurring fashion merely as favors to one who was already under so much obligation to the office because of the bail business which the office gave to him. There is not a shred of documentary proof that the checks represented "loans", or that they were ever repaid. The Salus office kept no books of account until June 1934 (which was the time when the proceedings began which culminated in the present hearing). It is claimed that the "loans" were repaid in cash. There are no receipts, vouchers, nor book entries of any kind. Blasband and Herbert W. Salus were both unable to state what is really "due" at the present time from Blasband by reason of these "loans". The court is of the firm opinion that these so-called "loan" checks to Blasband were really commissions or flat sums paid to him for his services in obtaining the representation by the Salus office of the drunken drivers in the manner and by the method heretofore described. This conclusion adds to the other elements in this unsavory practice that of the payment to a layman of part of the fees received for legal services in the cases referred by the layman. The contact of the respondent and of his associates with the various phases of this so-called "drunken driver racket", and their resulting relations with runners, clients, police and magistrates, were so obviously reprehensible as to require no further characterization.

3. As far as the respondent personally is concerned the most damaging evidence as to his violation of professional obligations was that presented in regard to the so-called "Kroekel case". The facts concerning it are set out at length in our opinion in the matter of Albert P. Goldberg, and therefore it is here necessary merely to point out the respondent's connection with the case. Kroekel was the respondent's client, and paid him a fee the amount of which the respondent does not remember but believes to have been $1,000 or $1,500. Kroekel was the defendant in a fornication and bastardy case in which Marie Clayton was the prosecutrix. After a 2-day trial he was found guilty, and an order was made of $9 a week for the support of the child and $35 for lying-in expenses. The respondent secured a new trial for his client, which was scheduled for October 26, 1933. It was at this point that the Salus office, obviously under the respondent's direction and generalship, began an unjustifiable course of conduct which was designed to force the prosecutrix to withdraw her case against Kroekel, and was so proceeded in as to accomplish that object.

The first step taken by the respondent, as testified by himself, was to tell Arthur Salus, his son and partner, to "get to work" on the Kroekel case. By the efforts of one McCauley, an investigator employed in their office, they got a Mrs. Stewart to come to their office, where Arthur Salus told her that her hus-

band was getting a divorce from her, that Marie Clayton was going to pay for it, and that Mr. Stewart would give her $100 in addition as a Christmas present. What the actual situation was in regard to the relations between Stewart and Mrs. Stewart, and between Stewart and Marie Clayton, is quite beside the question with which we are here concerned, namely, the conduct of the respondent and his associates in connection with the case.

After obtaining from Mrs. Stewart a preliminary affidavit on September 27, 1933, as to certain occurrences concerning Marie Clayton and Stewart, Arthur Salus on October 3, 1933, presented to her another affidavit which he requested her to make and in which it was definitely stated that Marie Clayton and Stewart had committed the crime of fornication and adultery respectively, within 2 years then last past, the object of the affidavit being to issue a warrant thereon for the arrest of Stewart and Marie Clayton. The respondent frankly admits that Arthur Salus had consulted him in reference to the preparation of this affidavit and the issuance of the warrant thereon, and that he, the respondent, approved thereof, telling Arthur Salus that he could draw up an affidavit on information and belief, but that there should be no arrest made unless an "overt act" was performed. Without reciting all the testimony bearing upon the point, it is sufficient here to state that there was no evidence justifying an affidavit that adultery or fornication had been committed, and neither the respondent nor anyone else who testified in the present hearing was able to point to any such evidence. Mrs. Stewart herself told Arthur Salus that she could not prove the fact, but he reassured her by stating that they would use the warrant only if they caught the parties in the criminal act. The respondent seeks to justify the making of this affidavit and the issuance of the warrant by likening it to a John Doe warrant, but the comparison is obviously absurd. Under the Act of March 31, 1860, P. L. 382, sec. 14, the making of the affidavit constituted the crime of perjury and the procuring of it subornation of perjury. It may be stated by way of anticipation that all the proceedings nominally instituted by Mrs. Stewart were evidently taken, not in order to serve any purpose of hers, but merely to procure the withdrawal of the case against Kroekel. Mrs. Stewart never paid Arthur Salus a fee nor was asked for one, and even the $8 costs of the warrant were paid by the Salus office, and the sum of $190, representing the fees and costs of the detectives employed to obtain evidence of adultery and fornication, as hereinafter stated, were paid by Kroekel. Indeed, when the purpose designed by the Salus office had been fulfilled, and the case against Stewart and Marie Clayton was ultimately dropped, Mrs. Stewart, who was supposed to be the client for whom that case had been undertaken, was not consulted about dropping it, nor had anything to say before the magistrate about dropping it, but was merely told afterwards by Arthur Salus that the case had been withdrawn. It is significant that Arthur Salus told her, after originally getting her in his office, that he would represent her in proceedings in the Municipal Court in order to obtain a support order for her against her husband, because "one good turn would deserve another"—thus naively furnishing an admission of the fact that Mrs. Stewart was being used solely as a pawn in the larger game in which Kroekel was primarily interested.

Mrs. Stewart did not authorize the employment of detectives; they were engaged by Arthur Salus apparently with the knowledge and approval of the respondent. The respondent himself testified that "when he had the arrest made it was a confidential matter I was handling myself and nobody

knew what I was doing but myself." The conduct of the detectives thus employed was shameless. They first attempted to compromise Marie Clayton by themselves making advances to her. Then after trailing the parties for several days they followed an automobile in which Marie Clayton and Stewart were riding, and when that automobile stopped at or near Stewart's own home they and their companions (five in all) arrested Marie Clayton and Stewart at the point of guns, took them to the police station in Springfield Township and then to the station house at Twelfth and Pine Streets, Philadelphia. As a result of this arrest Stewart was imprisoned at Moyamensing for 4 days. Marie Clayton was held by Magistrate Medway under $500 bail for a further hearing, although the maximum penalty for the crime of fornication is a fine of $100.

Marie Clayton was visited the morning after the arrest by Arthur P. Goldberg, a member of the bar in the respondent's office under salary from him, and he gave her his card and importuned her to let him be her lawyer. It is claimed both by him and by the respondent that this entry of Goldberg into the situation was purely a coincidence, but, while of course this is possible, the testimony concerning subsequent events makes it highly improbable and points rather to the conclusion that the part played by Goldberg was from the beginning a planned and motivated one. The respondent testified that when Goldberg informed him that he was representing Marie Clayton, he was very much surprised, but even if this be true his protestations to Goldberg were quite mild in character, even after Goldberg revealed to him that Marie Cayton wanted to withdraw the prosecution against Kroekel. He stated to the bar committee that when Goldberg made this statement to him, "I looked at him and said: 'You had better be careful, this looks kind of funny, you coming into the case and me on the other side, you had better get somebody else in it and see whatever you do, see that you protect yourself', and I said: 'So whatever turns out this girl cannot say you did something that might get you involved'." At another point he said: "I told him if there was going to be a contest I thought somebody else ought to have it, that he being in the office, ought not to be in it when I was in it, but at the same time there was nothing wrong in the thing." In answer to the question: "Even if it was not going to be fought out, if ... Mr. Goldberg's statement was 'Miss Clayton desires to withdraw the prosecution against the defendant', under such circumstances would not the thing for Goldberg to have done be to have withdrawn?" the respondent made the surprising answer: "If you want an honest answer, I would say no, because to withdraw under circumstances like that and refer it to another lawyer to my mind would be cheating the court. ... if Goldberg had sent her to somebody else—I don't think it was necessary, ... I think if Goldberg had taken this case and given it to somebody else and told them to handle it, I think that would have been cheating the court; I don't think it would have been honest at all." When asked: "But you advised him to get out, did you not?" he answered, "No; I told him he was in a peculiar position. I said: 'It looks peculiar', according to my recollection". In his testimony given in the present hearing he testified to a more positive attitude on his part, saying that when Goldberg first spoke to him about the matter he said to Goldberg: "Al, this is very serious. You better be very careful. I don't think you ought to mix into this thing". And at a later conversation: "Al, you better get somebody else in this case with you, or do something. You can never know what will happen, and I don't believe you ought to represent this girl." Goldberg himself

said before the bar committee that he does not "recall whether they (the respondent) advised me to get out. If my recollection serves me I was told to use my own judgment about it." At the hearing in court Goldberg testified: "The first time I spoke to him (the respondent) about it he told me to get out. Q. When did he tell you to use your own judgment? A. The last time I spoke to him about it." Marie Clayton herself testified that so far from Goldberg wishing to "get out" he persisted in urging her to let him represent her. "Mr. Goldberg told me if I got an outside lawyer he could not do so much for me as he could, being in Salus' office."

Whatever may be said as to these varying versions of the respondent's attitude toward Goldberg's representing Marie Clayton, the fact remains that Goldberg did stay in the case, that the respondent knew this, and that he and Goldberg finally stood side by side at the bar of the Municipal Court when the Kroekel prosecution was formally withdrawn. Moreover the evidence discloses that Marie Clayton never paid a fee to Goldberg nor was asked to pay one, indicating that his relation to her was not the usual representation of a client by a lawyer. Perhaps some explanation of this fact is afforded by a statement made by the respondent to the bar committee when, in answer to a remark of one of the committee: "I cannot understand Mr. Goldberg's attitude in that case when he says he did not ask for a fee and none was paid," the respondent said: "I don't know about that but maybe he was so glad I was getting results that he was willing to forego his fee."

The settlement made when the case came up for a second trial in the Municipal Court on October 26, 1933, was apparently a very unfair one. The bill of indictment against Kroekel was submitted for a verdict of not guilty. As justifying his insistence on such a disposition of the case, the respondent stated that the defense was "conceding something to the prosecutrix." Although this was not true, and Goldberg admits that he did not know what was meant by it, he, though attorney for the prosecutrix, made no denial of the respondent's assertion. The respondent says that he had had in mind to prosecute Marie Clayton for perjury, and the giving up of this intention was what he was conceding to her, but he admits that he had not advised her of that fact. The real reason for Marie Clayton's dropping the prosecution is quite apparent. She testified that Goldberg had told her that he would help her out of the case which had been brought against her if she would drop the Kroekel case, and also that he would try to get $100 or $200 for her if she dropped that case. Perhaps the reason was best stated by the respondent himself when he said before the bar committee: "Later on this girl was so frightened that we had her hooked up that she went into court and dropped the prosecution."

In the absence of representation by independent counsel it is not to be wondered at that the interests and the rights of the child were wholly neglected.

The day after the case against Kroekel was dropped the prosecution against Marie Clayton and Stewart, having served its purpose, was also dropped. The respondent then paid Marie Clayton $75. He says he paid it out of his own money as a mere matter of sympathy. Goldberg's version was that the $75 was a voluntary payment by Kroekel. In any event it was a mere pittance and probably really represented a twinge of conscience on the part of whoever was the donor.

Before the bar committee the respondent testified recklessly in regard to

Marie Clayton that: "I think we found out that she was under an assumed name and she had been arrested in a bawdy house. . . . we found it out afterwards, . . . there was a bawdy house raided and she had been arrested, and we were working on that to get it straightened out." There is not a word of truth in that statement.

In view of all the facts in the Kroekel case as above outlined it seems difficult to understand how the respondent could have felt justified in stating to the bar committee that : "referring to this Kroekel case to my mind there was not a thing done there that was not absolutely proper." On the contrary it seems almost unnecessary to point out that it was not at all proper that two lawyers in the same office, one the employer of the other, should have represented both sides of a case where the interests of the clients were so hopelessly antagonistic, that Mrs. Stewart should have been sought out and used as a mere figurehead for an ulterior purpose under the guise of being represented by another partner in the same office, that a false affidavit should have been sought and obtained from her, that detectives should have been employed apparently not so much to obtain evidence as to lay the ground for the subsequent intimidation of Marie Clayton, that Stewart and Marie Clayton should have been brought from a county where a crime was alleged to have been committed to a "favoring" magistrate in this county, that absurdly high bail should have been imposed by that magistrate as far as Marie Clayton was concerned, and that Marie Clayton should have been induced, under the guise of representation by a lawyer, to surrender her rights and to suffer the betrayal of her own interests and those of her child.

In view of all of the foregoing the court enters the following:

### Decree

And now, to wit, April 15, 1935, upon consideration of the rule entered by the court and after hearing thereon, it is ordered that the rule be made absolute, and that the respondent, Samuel W. Salus, be and is hereby disbarred from practicing at the bar of the Court of Common Pleas, the Orphans' Court, and the Municipal Court of the City and County of Philadelphia, and that his name be stricken from the roll of attorneys.

Notice of this order to be given by the prothonotary to the Supreme and Superior Courts of Pennsylvania, the several Courts of Common Pleas, the Orphans' Court, and the Municipal Court of the City and County of Philadelphia.